## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PRO PUBLICA, INC.
155 Avenue of the Americas, 13th Floor
New York, NY 10013

and

VIRGINIAN-PILOT MEDIA COMPANIES, LLC
150 West Brambleton Avenue
Norfolk, VA 23510

        Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS
810 Vermont Avenue NW
Washington, DC 20420

        Defendant.

Civil Action No. _____

## COMPLAINT

1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., seeking the release of withheld records that generally concern memoranda, reports, and correspondence at the United States Department of Veterans Affairs ("VA") regarding the effects of Agent Orange—laden with poisonous dioxin—on Vietnam veterans' children. Since May 2015, reporters Charles Ornstein at Pro Publica, Inc. ("ProPublica") and Mike Hixenbaugh at the Virginian-Pilot Media Companies, LLC ("The Virginian-Pilot") have sought disclosures by the VA. Dragging its feet, the VA has failed to come clean. VA's failure to disclose the requested records bears the hallmarks of a cover-up.

Moreover, the records relate, in part, to communications involving David J. Shulkin, MD, the current Under Secretary for Health at the VA who was just nominated by President-elect Trump, on January 11, 2017, to be the next Secretary of Veterans Affairs. Disclosure of these records takes on added urgency as this nomination proceeds and a new Secretary is confirmed and assumes leadership of the VA. The Secretary ultimately is responsible for VA's establishment of benefits, such as disability compensation, for individuals with ailments or disabilities linked to exposure to Agent Orange.

2.     ProPublica and The Virginian-Pilot seek declaratory, injunctive, and other appropriate relief with respect to the VA's unlawful withholdings of records requested under FOIA.

## JURISDICTION AND VENUE

3.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). In addition, this Court has jurisdiction pursuant to the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction to grant declaratory and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

4.     Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e) as the defendant is located in the District of Columbia and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

5.      Plaintiff ProPublica is a Delaware corporation and a non-profit entity under Section 501(c)(3) of the Internal Revenue code.  As an independent newsroom that produces investigative journalism in the public interest, ProPublica has been honored with three Pulitzer Prizes.  On average, ProPublica's web site has 1,100,000 unique visitors per month.  Since its publishing began in 2008, ProPublica's "publishing partners" have included more than 135 news organizations amounting to a "who's who" of the journalism world, including: the Atlantic, BBC, Boston Globe, Los Angeles Times, Miami Herald, New York Times, NPR News, Politico, USA Today, Virginian-Pilot [Norfolk], and the Washington Post.

6.      Plaintiff Virginian-Pilot Media Companies, LLC is a Virginia limited liability company and publisher of The Virginian-Pilot, which is the top source of news and information in southeast Virginia and northeastern North Carolina.  Founded in 1865, The Virginian-Pilot is a Pulitzer-prize-winning metropolitan newspaper serving almost 300,000 readers daily and over 400,000 on Sunday, and has been repeatedly named "best paper in the state of Virginia" for decades.

7.      ProPublica and The Virginian-Pilot, while not legally related to one another in terms of ownership or corporate governance, are "publishing partners."  Reporters from the two publications work together on investigative journalism, during which they research, report, and co-publish articles on a variety of topics including Agent Orange. The FOIA requests that are the subject of this action have been jointly pursued by ProPublica and The Virginian-Pilot—whose interests in these FOIA requests are

aligned—for the mutual benefit of their "reporting partners" Charles Ornstein and Mike Hixenbaugh as well as their readers.  The VA has treated the FOIA requests as having been jointly submitted by ProPublica and The Virginian-Pilot.  Moreover, by written agreements, ProPublica and The Virginian-Pilot each hold an undivided one-half interest in each of these FOIA requests.

8.     Defendant United States Department of Veterans Affairs is a federal agency headquartered at 810 Vermont Avenue NW, Washington, DC 20420.  VA has possession, custody, and control over the records sought by Plaintiffs.  VA is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## NATURE OF THE ACTION

9.     "Mixtures of 2,4-dichlorophenoxyacetic acid (2,4-D), 2,4,5-trichlorophen-oxyacetic acid (2,4,5-T), picloram, and cacodylic acid made up the bulk of the herbicides sprayed" by the U.S. military from 1962 to 1971 over Vietnam.  *See* VETERANS AND AGENT ORANGE: UPDATE 2014, National Academies of Sciences, Engineering, and Medicine (2016), at 1. "The herbicide mixtures used were named according to the colors of identification bands painted on the storage drums; the main chemical mixture sprayed was Agent Orange, a 50:50 mixture of 2,4-D and 2,4,5-T.  At the time of the spraying, 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD), the most toxic form of dioxin, was an unintended contaminant generated during the production of 2,4,5-T and so was present in Agent Orange as well as some other formulations sprayed in Vietnam." *Id.*

10.     It took an act of Congress—not the VA—to finally recognize the long-term health effects of such herbicides in Vietnam veterans.  Pursuant to 38 U.S.C. § 1116(f),

"a veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, shall be presumed to have been exposed during such service to an herbicide agent containing dioxin or 2,4-dichlorophenoxyacetic acid, and may be presumed to have been exposed during such service to any other chemical compound in an herbicide agent, unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during that service."

11.     Federal law and VA regulations provide that certain diseases are "considered to have been incurred in or aggravated by" service in Vietnam.  *See* 38 U.S.C. § 1116(a); 38 C.F.R. §§ 3.307(a)(6), 3.309(e), 3.313(b).  Those diseases are either specifically identified in the statute *or* identified by the VA, at its discretion, as "having positive association with exposure to an herbicide agent."  *Id.*

12.     While there is limited coverage for Vietnam veterans themselves who suffer from ailments or disabilities brought about by exposure to Agent Orange, coverage is virtually nonexistent for veterans' descendants, e.g., their biological children and grandchildren who face latter-generation consequences of Agent Orange.

13.     One of the VA's foremost experts on Agent Orange, Han K. Kang, Dr.P.H. ("Kang"), now retired, is the former director of the VA's War Related Illness and Injury Study Center ("WRIISC") as well as the VA's Environmental Epidemiology Service ("EES").  *See* VETERANS AND AGENT ORANGE: UPDATE 2012, The National Academies Press (2014), at x; *see also* Han K. Kang, "Surveillance of Health Outcomes of Gulf War Veterans" (Nov. 20, 2008), available at https://www.va.gov/gulfwaradvisorycommittee/

docs/kanggwac.pdf.   The WRIISC Director reports to the Chief Consultant, Post-Deployment Health within the Office of Public Health ("OPH") of the Veterans Health Administration ("VHA") for all programmatic and policy issues.   *See* http://www1.va.gov/vhapublications/ViewPublication.asp?pub_ID=2841.     Funding for WRIISC is provided by VHA.   *Id.*   WRIISC "is dedicated to Veterans' post-deployment health concerns and unique health care needs . . . through clinical care, research, education, and risk communication."   *See* http://www.warrelatedillness.va.gov/.   EES was "the premiere office for Vietnam/Agent Orange-related research within VA."   http://www.northflorida.va.gov/patients/education/agent_orange.doc.

14.     "One of Kang's most important areas of study involved assessing the reproductive health of women who served in Vietnam.   He found that the children of female Vietnam veterans were at increased risk for birth defects.   In 2000, because of Kang's findings, Congress passed legislation providing special benefits to children with birth defects born to mothers who had served in the war."   *See* https://serviceto americamedals.org/honorees/view_profile.php?profile=57.   In addition, "[Kang] realized that one of the most difficult aspects of studying the health effects of Agent Orange was that the nation did not have a complete picture of every man and woman who served in Vietnam and where they served.   So in the early 1990s, with the assistance of the Department of Defense and the National Personnel Records Center, he painstakingly assembled a national roster of living Vietnam veterans."   *Id.*

15.     "For the last three decades, [Kang's] research interest has been focused primarily on the health of US military and veteran populations who were potentially

exposed to environmental/occupational hazards during their military service." *See* Jomana Amara and Ann M. Hendricks, eds., MILITARY HEALTH CARE: FROM PRE-DEPLOYMENT TO POST-SEPARATION (2013), at "List of contributors," relevant portion available at https://books.google.com/.

16.     Another of the VA's prominent experts on Agent Orange throughout the years, Michael R. Peterson, DVM, MPH, DrPH ("Peterson"), was formerly the Chief Consultant, Post-Deployment Health within the VHA's OPH.  His team at the VA was responsible "for doing the epidemiological studies or the population-based studies that ask the question along the lines of: 'Is there a difference in terms of health outcomes between those who deployed and those who did not deploy?'"  *See* http://www.cavc bar.net/downloads/2013%20Judicial%20Conference%20Bar%20Association%20Causati on%20Transcript-2.pdf.  During that work at the VA, Peterson explained, in nuanced fashion, that on his team "we don't talk about causation . . . [w]e really deal more with association and with risk." *Id.*

17.     Peterson testified to the United States Senate's Committee on Veterans' Affairs in 2009: "One of the many lessons that VA has learned from experiences with Agent Orange . . . is that information regarding possible exposures to environmental agents and other toxicants, both within the combat theater and other areas in which our troops operate, must be received and acted upon by VA as early as possible." *See* http://www.veterans.senate.gov/imo/media/doc/peterson_100809.pdf.

18.     Thirty years ago, then-Lieutenant Colonel Peterson served as a member of the team conducting "an epidemiologic investigation of Air Force personnel who aerially

disseminated herbicides in the Vietnam War (code-named Operation Ranch Hand)." *See* AIR FORCE HEALTH STUDY.  AN EPIDEMIOLOGIC INVESTIGATION OF HEALTH EFFECTS IN AIR FORCE PERSONNEL FOLLOWING EXPOSURE TO HERBICIDES.  VOLUME I.  FIRST FOLLOWUP EXAMINATION RESULTS, JANUARY 1985 TO SEPTEMBER 1987, AD–A188 262 (Oct. 1987), at vii, available at http://www.dtic.mil/dtic/tr/fulltext/u2/a188262.pdf.  The study "conclude[d] that there is insufficient evidence to support a cause and effect relationship between herbicide exposure and adverse health in the Ranch Hand group at this time." *Id.* at vi.

19.     Peterson's 1987 study repeatedly cites the work of Alvin L. Young, Ph.D, a.k.a. "Dr. Orange"—who certainly has critics today—and makes a point of highlighting non-scientific factors: "In the larger context of environmental controversies, Young aptly described the Agent Orange issue as being at the crossroads of science and social concern.  The scientific community has responded to the dioxin question by a massive research effort, which in concert with class action lawsuits, is expected to cost more than a billion dollars in the near future." *Id.* at 10-1.

20.     Despite the conclusion of his Air Force Health Study, Peterson's early work should have sounded alarm bells:  His research, published two years later in 1989, found that TCDD, the toxic dioxin contaminant in Agent Orange, had a "median half-life" in Ranch Hand veterans' blood serum of 7.1 ***years***.  *See* James L. Pirkle et al. [and Michael R. Peterson], *Estimates of the Half-Life of 2,3,7,8-tetrachlorodibenzo-p-dioxin in Vietnam Veterans of Operation Ranch Hand*, 27 JOURNAL OF TOXICOLOGY AND ENVIRONMENTAL HEALTH 165 (1989).  By comparison, heroin, cocaine, and cyanide have terminal

elimination half-lives of 2-5 *minutes*, 0.5-1 *hour*, and 19 *hours*, respectively.  *See* Martin Schulz et al., *Therapeutic and Toxic Blood Concentrations of Nearly 1,000 Drugs and other Xenobiotics*, 16 CRITICAL CARE R136 (2012), available at https://www.ncbi. nlm.nih.gov/pmc/articles/PMC3580721/pdf/cc11441.pdf and http://www.biomedcentral. com/content/supplementary/cc11441-S1.DOC (Table of "Therapeutic ('Normal'), Toxic, and Comatose-Fatal Blood-Plasma Concentrations (mg/L) in Man").  The pain reliever ibuprofen's half-life is 2-3 *hours*, roughly 20-30,000 times shorter than the half-life of TCDD reported by Peterson.  *Id.*

21.    Irrespective of the work of Kang and Peterson—two of VA's most recognized researchers and leaders over the years concerning Agent Orange—"thousands . . . are [still] grappling with a chilling prospect: Could Agent Orange, the herbicide linked to health problems in Vietnam veterans, have also harmed their children?"  *See* Charles Ornstein, Hannah Fresques & Mike Hixenbaugh, *The Children of Agent Orange*, PROPUBLICA and THE VIRGINIAN-PILOT (Dec. 16, 2016), available at https://www.propublica.org/article/the-children-of-agent-orange.    "For decades, the Department of Veterans Affairs has collected — and ignored — reams of information that could have helped answer that question."  *Id.*

22.    "Concerns that Agent Orange was not just sickening vets but also causing birth defects in their children surfaced after troops returned from war four decades ago. Veterans reported that some of their children had unusual defects — missing limbs, extra limbs and other diseases — that didn't run in their families.  Some government studies were done . . . but they generally dismissed an association."  *Id.*

23.   "The VA makes [disability] payments only to those [children] who have spina bifida, in which the spinal cord doesn't develop properly, and the children of a small number of female Vietnam vets with 18 other diseases.  That leaves out the vast majority of vets' ailing children."  *Id.*

24.   "Agent Orange might jump through the generations."   *See* Joanne Kimberlin, *"We Want It to Stop with Us": Agent Orange Curse Hangs Over Families of Vietnam Veterans*, THE VIRGINIAN-PILOT (Dec. 16, 2016), available at http://pilotonline.com/news/military/veterans/vietnam/we-want-it-to-stop-with-us-agent-orange-curse/article_3c52d33c-069a-5535-bea4-ced2d1e555c5.html.   And the evidence is not just found among Americans.  "In Vietnam, orphanages house children with disabilities four generations after the war."  *Id.*

25.   More than forty years after the end of the war, Vietnam veterans' children are suffering its consequences.  One father cautioned his son to "be aware of the ravages of A.O."   *See* Stephen M. Katz, as told to Mike Hixenbaugh & Charles Ornstein, *A Father's War, A Son's Toxic Inheritance*, PROPUBLICA and THE VIRGINIAN-PILOT (June 17, 2016), available at https://www.propublica.org/article/a-fathers-war-a-sons-toxic-inheritance.  The father "sprayed Agent Orange along riverbanks in Vietnam, often soaking his uniform in the herbicide" and later developed "serious health problems."  *Id.* His son was later born with a heart defect and developed an underactive thyroid, problems with his nervous and immune systems, type-2 diabetes, hypertension and a nerve disorder that severely limits the use of his right hand.  *Id.*

26.    Other children of veterans suspect Agent Orange is to blame for their health problems, including heart defects, endometriosis and fertility issues, lupus, and birth defects never before seen in their family tree.  *See* Terry Parris Jr., Charles Ornstein, & Mike Hixenbaugh, *Reliving Agent Orange: What the Children of Vietnam Vets Have to Say*, PROPUBLICA and THE VIRGINIAN-PILOT (June 17, 2016), available at https://www.propublica.org/article/reliving-agent-orange-what-the-children-of-vietnam-vets-have-to-say.

27.    "[F]or years, [a mother] didn't fully connect the bad news in her life with her husband's possible Agent Orange exposure."  Charles Ornstein, *A Public Official's Private Pain*, PROPUBLICA (Dec. 16, 2016), available at https://www.propublica.org/article/linda-kochmar-agent-orange.  But her daughter had no sight in one eye, her son died suddenly at age 21 of cardiomyopathy, and her granddaughter was born with cerebral palsy and a genetic disorder that causes persistent diarrhea.  *Id.*  There was no family history of these conditions.  *Id.*

28.    "[S]cores of children [] struggle with strange, debilitating health problems and wonder if the herbicide that sickened their fathers has also affected them."  *See* Mike Hixenbaugh & Charles Ornstein, *Rethinking the Cost of War.  What if Casualties Don't End on the Battlefield, but Extend to Future Generations?*, PROPUBLICA and THE VIRGINIAN-PILOT (Dec. 30, 2016), available at https://www.propublica.org/article/rethinking-the-cost-of-war.  "For decades, the federal government has resisted addressing these issues, which could ultimately cost billions of dollars in new disability claims. When science does suggest a connection, the VA has hesitated to take action, instead

weighing political and financial costs.   And in some cases, officials have turned to a known skeptic of Agent Orange's deadly effects to guide the VA's decisions." *Id.* "Frustrated vets summarize the VA's position this way: 'Delay, deny, wait till I die.'" *Id.*

29.    Recognizing a growing body of evidence—whether scientific or anecdotal—that Agent Orange's horrific legacy is not limited to veterans themselves, on December 16, 2016, the President signed into law the "Jeff Miller and Richard Blumenthal Veterans Health Care and Benefits Improvement Act of 2016."  That law, in part, requires the Secretary of Veterans Affairs to obtain "an assessment on scientific research relating to the descendants of individuals with toxic exposure"—covering hazardous agents inhaled, ingested, or having come into contact with veterans—and also requires certain follow-on research and advisory activities.  *See* Pub. L. No. 114-315 at §§ 631-634.  Nevertheless, it may take two and a half years before that assessment is completed.  *Id.*

30.    In the meantime, with Kang's and Peterson's views and influence remaining shrouded in mystery at least to some extent, the interested public continues to be largely uninformed concerning the effects of Agent Orange, and the poisonous dioxin contained therein, on Vietnam veterans' offspring.  It seems that the VA, at least publicly, remains in a state of "denial" or, possibly worse, has willfully blinded itself to the ramifications of Agent Orange exposures during the Vietnam War on future generations.

31.    Recounting the VA's long-standing "willful ignorance," the legislative director of Vietnam Veterans of America last year could not hide his frustration that "[t]hey've tried to undo anything and everything that might lead to further research into

the effects of Agent Orange exposure." *See* Mike Hixenbaugh & Charles Ornstein, *Researchers Call for More Study of Agent Orange Effects on Vets and Their Kids*, PROPUBLICA and THE VIRGINIAN-PILOT (Mar. 11, 2016), available at https://www.pro publica.org/article/researchers-call-for-more-study-of-agent-orange-effects-on-vets-their-kids.

32.     Only through transparency can the public have confidence in the VA's commitment "[t]o care for him who shall have borne the battle."  The VA's integrity is called into question when it maintains in secrecy its knowledge about how dioxin-containing Agent Orange is (or may be) linked to ailments and birth defects in Vietnam veterans' offspring.  Members of the armed forces unwittingly received an unprecedented poisoning while serving in Vietnam.  The public is owed full and frank disclosure by the VA concerning the deleterious effects of Agent Orange on our veterans' descendants.

### PLAINTIFFS' FIRST FOIA REQUEST AND DEFENDANT'S FAILURE TO COMPLY WITH FOIA

33.     By email dated May 12, 2015, The Virginian-Pilot submitted a FOIA request to the VA's "FOIA Service" ("First FOIA Request") in which disclosure was sought with respect to:

- all correspondence (including emails and letters) as well as any memos and reports between January 1, 2009 and the date this request is completed *to and from Han K. Kang*, former director of VA's [WRIISC], regarding Agent Orange and dioxin, and its effects on veterans and/or their offspring;

- all correspondence (including emails and letters) as well as any memos and reports between January 1, 2009 and the date this request is completed *to and from Michael Peterson*, former Chief Consultant, Post-Deployment Health, Public Health, regarding Agent Orange and dioxin and its effects on veterans and/or their offspring; and

- all ***Congressional correspondence*** (emails, letters, memos and reports) between January 1, 2009 and the date this request is completed to and from [VA] staff regarding Agent Orange and dioxin and its effects on veterans and/or their offspring.

*See* **Exhibit 1** (emphasis added).

34.     The First FOIA Request sought waiver of any applicable FOIA processing fees because the "request [was] made as part of the news gathering process and not for commercial use." *Id.*

35.     The First FOIA Request also stated that the requested "information is of timely value" and sought disclosure within 20 business days as required by the FOIA statute. *Id.*

36.     By email dated May 19, 2015, the VA's FOIA Service acknowledged receipt of the First FOIA Request.  *See* **Exhibit 2**.  The VA stated: "The records, if they exist, would be maintained by the Veterans Health Administration (VHA) and the Office of Congressional and Legislative Affairs (OCLA).  Therefore, we are redirecting your request to these offices for a file search and a direct reply to you." *Id.*  The referral to VHA was assigned tracking number 15-05014-F while the referral to OCLA was assigned tracking number 15-05015-F. *Id.*

37.     By email and letter dated May 19, 2015, the VHA acknowledged receipt of the First FOIA Request, tracking number 15-05014-F.  *See* **Exhibit 3**.

38.     On January 11, 2016, The Virginian-Pilot sent an email to the VHA requesting the status of processing the First FOIA Request which was submitted eight months prior.  *See* **Exhibit 4**.  The email was sent by Mike Hixenbaugh who identified

himself as "a journalist with The Virginian-Pilot newspaper" and who copied his "reporting partner, Charles Ornstein of ProPublica" on the email.  *Id.*

39.    On January 22, 2016, The Virginian-Pilot sent another email to the VHA, copying ProPublica, concerning the First FOIA Request and stating "[p]lease respond promptly with an update on the status of this request and an estimate for when it will be completed." *Id.*

40.    On January 30, 2016, The Virginian-Pilot sent yet another email to the VA, copying ProPublica, requesting the status of processing the First FOIA Request and stating "I've emailed several times . . . and have called FOIA staffers in the office" to no avail.  *Id.*   The email also inquired about "what can be done to expedite this [FOIA] request?"  *Id.*   The email was sent by Mike Hixenbaugh, who also stated "I'm working with Charles Ornstein of ProPublica" and "[p]lease copy him on your response."  *Id.*

41.    ProPublica sent a follow-up email to the VA on February 2, 2016, copying The Virginian-Pilot.  *Id.*   In response, on February 2, 2016, the VA informed both ProPublica and The Virginian-Pilot that the VHA FOIA Office would "provide you some feedback." *Id.*

42.    ProPublica sent a further follow-up email to the VHA FOIA Office on February 4, 2016, copying The Virginian-Pilot.  *Id.*   Finally, on February 5, 2016, the VHA FOIA Office sent an email to ProPublica and The Virginian-Pilot stating that it was still "waiting for our Information Technology (IT) to complete the record search" which "was submitted to IT on May 28, 2015." *Id.*   VHA's email also stated that it "requested an estimated completion date from [IT]." *Id.*

43.     The Virginian-Pilot sent yet another follow-up email on February 15, 2016, in part to VHA and OCLA, while copying ProPublica, and asking, "Have you been able to obtain an estimated completion date?"  *Id.*  The email further stated: "This particular request is a top priority for us.  I will discus[s] with [the Office of Government Information Services ("OGIS")] if we're not able to make progress on this."  *Id.*  On February 17, 2016, the VHA FOIA Office responded that "IT has not yet provided [] [] an estimated delivery date."  *Id.*

44.     On February 17, 2016, The Virginian-Pilot sent an email to OGIS, copying ProPublica, and stated:

> I'm writing to request assistance with the following matter: I'm a reporter for The Virginian-Pilot newspaper working on a story in partnership with ProPublica (Charles Ornstein copied).  In May 2015, I requested the following from the Department of Veterans Affairs:
>
> \* \* \*
>
> For the past nine months, the VA FOIA office has told me that IT is looking into the request.  But . . . IT is apparently not responsive to questions about when the request might be completed.
>
> The FOIA tracking number is 15-05014-F.  It's one of several unfulfilled requests ProPublica has with the VA.  Can you offer any assistance or tips for moving this along?

*See* **Exhibit 5**.

45.     A "Facilitator" at OGIS responded to The Virginian-Pilot by email on March 7, 2016 and stated that OGIS would "reach out to VA regarding the status of [] request no. 15-05014-F and . . . get an estimated date of completion . . ."  *See* **Exhibit 6**. Then, on March 9, 2016, the Facilitator at OGIS responded:

> . . . [T]he FOIA Public Liaison at VHA . . . [is] waiting on the information technology (IT) department to conduct the email search for responsive records. She placed the request with IT on 6/2/2015 and followed up with IT on 6/16/2015, 7/8/2015, 8/21/2015, 9/8/2015, 9/23/2015, 10/28/2015, 2/5/2016, 2/16/2016, and 3/1/2016. She can't give an estimated date of completion because she has no idea a. if there are responsive records b. if so, the volume VA would have [to] process. She has received 8 pages of congressional correspondence which is constituent related.
>
> I hope you find this information useful. Unfortunately, OGIS has no investigatory or enforcement power, nor can we compel an agency to release documents, so there isn't much more assistance we can provide.

*Id.*

46.    On March 24, 2016, The Virginian-Pilot sent another email to the VHA FOIA Office, copying ProPublica, again asking, "Can you provide an estimated delivery date for this request?" *See* **Exhibit 4**.

47.    On April 6, 2016, Richard J. Tofel, the President of ProPublica, sent a letter to Richard J. Hipolit, the VA's Deputy General Counsel. The letter stated:

> I am writing to seek your assistance in overcoming barriers faced by ProPublica and our publishing partners at The Virginian-Pilot in accessing public information under the Freedom of Information Act. Our organizations have been stymied in several important requests for information related to the VA's handling of research related to Agent Orange exposure by Vietnam era veterans. Specifically we have sought the following information:
>
> 15-05014-F
> (May 12, 2015)
>
> * * *
>
> 15-05015-F
> (May 12, 2015)
>
> * * *

> These requests are of paramount importance to hundreds of thousands, perhaps millions of Vietnam era veterans, some of whom are being diagnosed daily with illnesses that are presumed to be connected with their Vietnam service.
>
> ***From our end, frankly, this systematic inaction appears to us a lot like a cover up. It's surprising that a department dedicated to assisting the nation's veterans would want journalists to have that sense.***
>
> I hope you will look into this matter personally, in a transparent manner and with adherence to both the spirit and letter of FOIA.

*See* **Exhibit 7** (emphasis added).  No response was received by ProPublica.

48.     On May 25, 2016, The Virginian-Pilot sent still another follow-up email to the VHA FOIA Office, copying ProPublica, requesting "an update . . . [and] ask[ing] -- as we approach our deadline to report on these important matters of public interests -- that your office would give consideration to completing these requests quickly, especially [15-05014-F and 15-05015-F which] are now more than a year old." *See* **Exhibit 8**.

49.     The VHA FOIA Office responded to The Virginian-Pilot by email on May 26, 2016, copying the FOIA officer at OCLA as well as ProPublica, and stated: "Concerning 15-05014-F, OI&T completed their search and I received the files last week. I'm in the process of moving the documents from the multiple files to one file so that I may begin my review process.  Once I have moved all of the documents I will have a better sense of the number of documents and time frame." *Id.*  With respect to tracking number 15-05015-F, the VHA FOIA Office requested that OCLA's FOIA officer "respond [] [] directly with a status update." *Id.*

50.     ProPublica sent follow-up emails to the VHA FOIA Office on June 3, 2016 and June 7, 2016, each time copying The Virginian-Pilot, again inquiring about the status of processing the First FOIA Request.  *Id.*  On June 10, 2016, the VHA FOIA Office responded by email to ProPublica and The Virginian-Pilot: "I'm still in the process of moving files.  I'm planning on providing partial responses as I work through the documents.  I anticipate the first response by the middle of July."  *Id.*

51.     On July 19, 2016, ProPublica sent another follow-up email to the VHA FOIA Office, once again inquiring about the status of processing the First FOIA Request.  *Id.*  The VHA FOIA Office responded by email that day, on July 19, 2016, and stated: "My review is going slow due to how OI&T provided the documents.  The documents were provided in layers of folders and subfolders to which I have to move each document individually.  I am nearing the completion of moving the documents from the first folder. Once completed with that folder, I will issue a partial response."  *Id.*

52.     On August 16, 2016, ProPublica sent another follow-up email to the VHA FOIA Office, again inquiring about the status of processing the First FOIA Request.  *See* **Exhibit 9**.  The VHA FOIA Office responded on August 17, 2016 and stated: "I have a meeting . . . with [OI&T] staff for them to install a software plug-in that I will need" and "[t]he documents are being uploaded to the software."  *Id.*

53.     ProPublica sent yet another follow-up email to the VHA FOIA Office on September 13, 2016 inquiring about the status of processing the First FOIA Request.  *See* **Exhibit 10**.  On September 14, 2016, the VHA FOIA Office responded to ProPublica by email: "The review is going s[l]o[w] as I'm learning the system.  As I [] become more

familiar with the system, my review time will pick up.  I'm still planning on doing partial

responses." *Id.*  Later that day, on September 14, 2016, ProPublica inquired by email:

"Any ETA for a first partial response?" *Id.*  The VHA FOIA Office responded to

ProPublica on September 15, 2016 that "I'm hoping to have the first partial to you by the

middle of October if not sooner." *Id.*

54.    Again, ProPublica sent a follow-up email to the VHA FOIA Office on

October 25, 2016 inquiring about the status of processing the First FOIA Request.  *Id.*

Later that day, on October 25, 2016, the VHA FOIA Office responded to ProPublica by

email: "Unfortunately due to other office priorities, I have been unable to devote the time

to this request as I had hoped.  In hopes of rectifying, I have blocked out two hours of my

day to devote to this request.  If I'm able to devote more time each day, I will." *Id.*

55.    On December 9, 2016, ProPublica sent one more follow-up email to the

VHA FOIA Office inquiring about the status of processing the First FOIA Request.  *See*

**Exhibit 11**.  Later that day, on December 9, 2016, the VHA FOIA Office responded:

"Unfortunately due to staffing within the office and other assigned responsibilities, I am

unable to devote the time to your request as I had planned.  For your awareness, I will be

out of the office the next two weeks.  Upon my return to the office, I will do everything I

can to begin to provide partial responses." *Id.*

56.    As a separate matter, with respect to tracking number 15-05015-F, the

VA's OCLA issued a response determination to The Virginian-Pilot on August 25, 2015,

by email, concluding that "*[t]he documents you seek regarding [Congressional]*

*correspondence from January 9, 2011 to the present, were not* maintained in the Office

of Congressional and Legislative Affairs." *See* **Exhibit 12**. The Virginian-Pilot administratively appealed that determination by email to VA's Office of General Counsel ("OGC") on September 1, 2015. *See* **Exhibit 13**. The administrative appeal stated that OCLA's response "defies logic" and "leaves two possibilities: [e]ither the VA is withholding the documentation, or it has destroyed the government records." *Id.* Furthermore, the administrative appeal stated: "If the records are held in an office other than [OCLA], I request copies. If the correspondence has been disposed of, I request a written statement explaining why and under whose authority the records were destroyed." *Id.*

57. Over fifteen months later, on December 8, 2016, the VA's OGC remanded the FOIA request for tracking number 15-05015-F to OCLA because it could not "confirm . . . the reasonableness of the search for responsive information" and also "directed OCLA to refer [the] FOIA request to other VA offices that may have responsive information." *See* **Exhibit 14**.

58. To date, no records have been produced by the VA (whether by VHA, OCLA, or otherwise) to ProPublica or The Virginian-Pilot in response to the First FOIA Request.

59. Despite the passage of over twenty months since the First FOIA Request was submitted, ProPublica has not received any response determination whatsoever from VHA in connection with the First FOIA Request.

## PLAINTIFFS' SECOND FOIA REQUEST AND
## DEFENDANT'S FAILURE TO COMPLY WITH FOIA

60.     By email dated September 1, 2015, The Virginian-Pilot submitted a FOIA request to the VA's FOIA Service ("Second FOIA Request") in which disclosure was sought with respect to all correspondence (including emails and letters) as well as any memoranda and reports regarding Agent Orange and dioxin, and its effects on veterans and/or their offspring, between January 1, 2009 and the date this request is completed, to and from:

- the **Secretary of Veterans Affairs** (including previous and interim office holders, and the current office holder);

- the **Under Secretary for Health** (including previous and interim office holders, and the current office holder);

- the **Under Secretary for Benefits** (including previous and interim office holders, and the current office holder);

- the **Deputy Inspector General** (including previous and interim office holders, and the current office holder);

- the **Assistant Secretary for Congressional and Legislative Affairs** (including previous and interim office holders, and the current office holder); and

- the **Assistant Secretary for Policy and Planning** (including previous and interim office holders, and the current office holder).

See **Exhibit 15** (emphasis added).

61.     Among these office holders, the Under Secretary for Health is the "Chief Executive of [VHA]."   *See*  http://www1.va.gov/directory/guide/manager.asp?pnum= 30282.  President-elect Donald Trump announced on January 11, 2017 that the current Under Secretary for Health, Dr. David J. Shulkin, is his nominee to be the next Secretary of the VA.  *See* https://greatagain.gov/shulkin-302876b6595a#.d8h1z1g6y.  Dr. Shulkin

would be the first non-veteran to lead the VA.  *See* https://www.propublica.org/article/
the-chosen-who-trump-is-putting-in-power.  In his role as Under Secretary for Health,
Dr. Shulkin's responsibilities have certainly included oversight of matters related to
Agent Orange.  For example, on December 7, 2016, Dr. Shulkin issued VHA Directive
1302 entitled "Agent Orange Registry (AOR) Program" concerning the "policy and
procedures" applicable to "a computerized index of Veteran participants, and the coded
findings of the Agent Orange Program physical examinations, including related
diagnostic results."  *See* https://www.va.gov/vhapublications/ViewPublication.asp?pub_
ID=4303.

62.     The Second FOIA Request sought waiver of any applicable FOIA
processing fees because the "request [was] made as part of the news gathering process
and not for commercial use."  *Id.*

63.     The Second FOIA Request also stated that the requested "information is of
timely value" and sought disclosure within 20 business days as required by the FOIA
statute.  *Id.*

64.     By email dated September 3, 2015, the VA's FOIA Service acknowledged
receipt of the Second FOIA Request.  *See* **Exhibit 16**.  The Second FOIA Request was
redirected to: the Office of the Secretary of Veterans Affairs ("OSVA") and assigned
tracking number 15-07637-F, the VHA and assigned tracking number 15-07638-F, the
Veterans Benefits Administration ("VBA") and assigned tracking number 15-07639-F,
OCLA and assigned tracking number 15-07640-F, the Office of Policy and Planning

("OPP") and assigned tracking number 15-07641-F, and the Office of Inspector General ("OIG") without assignment of a tracking number. *Id.*

65. By email and letter dated September 3, 2015 to The Virginian-Pilot, the VHA FOIA Office acknowledged receipt of the FOIA request assigned tracking number 15-07638-F. *See* **Exhibit 17**.

66. By emails and letter dated September 24, 2015, OSVA provided a response determination for tracking number 15-07637-F in which 67 pages of records were produced in part. *See* **Exhibit 18**.

67. On January 30, 2016, The Virginian-Pilot sent an email to the VA, copying ProPublica, requesting the status of processing the Second FOIA Request and stating that it had "yet to receive information from these requests submitted in September [2015]: [] 15-07638-F, 15-07639-F, 15-07640-F, and 15-07641-F." *See* **Exhibit 4**. The email was sent by Mike Hixenbaugh who stated that "I'm working with Charles Ornstein of ProPublica" and "[p]lease copy him on your response." *Id.*

68. ProPublica sent a follow-up email to the VA on February 2, 2016, copying The Virginian-Pilot. *Id.* In response, on February 2, 2016, the VA informed both ProPublica and The Virginian-Pilot that the VHA FOIA Office would "provide you some feedback." *Id.*

69. ProPublica sent a further follow-up email to the VHA FOIA Office on February 4, 2016, copying The Virginian-Pilot. *Id.* Finally, on February 5, 2016, the VHA FOIA Office sent an email to ProPublica and The Virginian-Pilot that merely

described as "open" each of tracking numbers 15-07638-F, 15-07639-F, 15-07640-F, and 15-07641-F. *Id.*

70.     An email and a letter dated February 8, 2016 from OCLA to The Virginian-Pilot provided a response for tracking number 15-07640-F and stated that "[t]he documents you seek regarding 'Agent Orange and Dioxin on veterans and/or its offspring' were not found in [OCLA]." *See* **Exhibit 19**.

71.     On April 6, 2016, Richard J. Tofel, the President of ProPublica, sent a letter to Richard J. Hipolit, the VA's Deputy General Counsel, stating that VA's "systemic inaction" with respect to, *inter alia*, FOIA tracking numbers 15-07638-F (VHA), 15-07639-F (VBA), and 15-07641-F (OPP), "appears to us a lot like a cover up." *See* **Exhibit 7**.  No response was received by ProPublica.

72.     On May 25, 2016, The Virginian-Pilot sent san email to the VHA FOIA Office, copying ProPublica, requesting "an update . . . [and] ask[ing] -- as we approach our deadline to report on these important matters of public interests -- that your office would give consideration to completing these requests quickly." *See* **Exhibit 8**.  The email identified various FOIA requests including FOIA tracking numbers 15-07638-F (VHA), 15-07639-F (VBA), and 15-07641-F (OPP). *Id.*

73.     On May 26, 2016, by email, the VHA FOIA Office forwarded the May 25, 2016 request that processing be completed "quickly" to the FOIA officers at VBA and OPP, among others; The Virginian-Pilot and ProPublica were included on the email as well. *Id.*

74.     By email to ProPublica on July 7, 2016, the VHA FOIA Officer stated that on "September 11, 201[5] a comprehensive search email was sent to OI&T" and that "[f]ollow-up's to [the] September 11, 201[5] search request to OI&T were conducted in writing on the following dates: October 15, 2015, November 23, 2015, December 23, 2015, February 10, 2016, February 25, 2016, March 2, 2016, April 2, 2016, May 9, 2016, June 6, 2016, [and] July 7, 2016." *See* **Exhibit 20**.

75.     By email on July 7, 2016, ProPublica requested assistance from OGIS concerning the processing of tracking number 15-07638-F.  *See* **Exhibit 21**.  ProPublica stated that "the VA itself has been unable to get a response from its own Office of Information and Technology" and ProPublica experienced "problems even getting answers from within the VA."  *Id.*  ProPublica requested "assistance to help move this matter along, to completion."  *Id.*

76.     On July 13, 2016, ProPublica's senior reporter Charles Ornstein sent a letter to LaVerne H. Council, Assistant Secretary for Information Technology and Chief Information Officer, Office of Information Technology at the VA as well as to Leigh A. Bradley, General Counsel of the VA, concerning the "delays and lack of responsiveness" by VA in connection with tracking number 15-07638-F.  *See* **Exhibit 22**.  The letter stated:

> I am writing to seek your assistance in overcoming unacceptable barriers and delays faced by ProPublica and The Virginian-Pilot in accessing public information under the Freedom of Information Act.  It is our understanding that the VA's FOIA office has been unable to process at least some of our requests due to delays and a lack of responsiveness by VA's Office of Information and Technology.

We are focusing this letter on a single request, made on September 3, 2015, captioned 15-07638-F. . . .

\* \* \*

We have regularly checked in with the VA FOIA office for updates on this request, as we do with all of our requests. We recently were told that the request was received by the VHA FOIA office on September 3, 2015. The FOIA office was advised by OI&T that for the Enterprise Exchange teams to conduct an email search, OI&T needed the exact names of the mailboxes to be searched, including the email address; the exact words/phrases to use as search terms; and the exact date timeframe to be searched. That information was provided to OI&T on September 11, 2015.

The FOIA office sought updates in writing from OI&T on the following dates: October 15, 2015, November 23, 2015, December 23, 2015, February 10, 2016, February 25, 2016, March 2, 2016, April 2, 2016, May 9, 2016, June 6, 2016, and July 7, 2016. To date, there have been no responsive records shared with the FOIA office nor has there been an estimated production date.

It's been nearly a year since we submitted this FOIA request to the VA, and the department's own FOIA office does not appear to have been successful in getting a response from its OI&T.

This request is of paramount importance to hundreds of thousands, perhaps millions of Vietnam era veterans, some of whom are being diagnosed daily with illnesses that are presumptively assumed to be connected with their Vietnam service. ***Given the amount of coverage we, along with the Virginian-Pilot, have given to the Agent Orange question, at a time when practically no one is writing about this, from our end this is beginning to feel a lot like an intentional effort to stonewall. It's surprising that the department would want journalists to have that sense.***

Given the [P]resident's recent reaffirmation of the value of the Freedom of Information Act, we would like to ask you and your staffs to work with the VA FOIA office to produce responsive records. If we do not receive a response shortly, we will have no choice but to consider our other options for attempting to acquire this information, a step we do not

believe would be in the best interest of the taxpayers or veterans.

*   *   *

*Id.* (emphasis added).

77.     On July 21, 2016, a Facilitator at OGIS sent an email to ProPublica and The Virginian-Pilot acknowledging the request for assistance with respect to tracking number 15-07638-F.  *See* **Exhibit 23**.

78.     By letter to ProPublica dated August 3, 2016, VA's OGC docketed ProPublica's letter to Ms. Council and Ms. Bradley concerning tracking number 15-07638-F "as an appeal under [FOIA] stemming from a non-response by [VHA]."  *See* **Exhibit 24**.

79.     By email and letter dated August 16, 2016 to ProPublica, copied to The Virginian-Pilot, OGIS stated that "the VHA FOIA Office tasked OI&T with conducting a search for responsive records" but that the search had been hindered because the relevant records were "archived" and there had been "technical difficulties" in retrieving them. *See* **Exhibit 23**.  OGIS further stated that the VHA FOIA Office "has yet to receive all of the records you seek" but would "begin reviewing the responsive records and responding to you on a rolling basis."  *Id.*  Finally, OGIS concluded that "there is no further action for us to take and we consider this matter closed."  *Id.*

80.     By email and letter dated August 26, 2016, VHA provided to The Virginian-Pilot a "partial initial agency decision" for tracking number 15-07638-F in which 26 pages of records were released in part.  *See* **Exhibit 25**.  Twelve of the pages were referred for "a direct response from VBA on their release determination."   In the

letter, the VHA FOIA Officer also stated that "to respond more efficiently to your request, once additional records are received, we will begin reviewing the responsive records and responding to you on a rolling basis." *Id.* The VHA FOIA Officer also stated that "[a]t this time I do not have a projected release date for the next set of records." *Id.*

81. On October 28, 2016, ProPublica sent one more email to VHA requesting a status update concerning tracking number 15-07638-F. *See* **Exhibit 26**. VHA responded to ProPublica by email that same day, on October 28, 2016, and stated "the search is not yet completed." *Id.*

82. To date, despite the passage of over sixteen months since the Second FOIA Request was filed, the VA's VBA, OPP, and OIG have neither made a response determination nor produced any records to The Virginian-Pilot or ProPublica in response to the Second FOIA Request.

83. To date, despite the passage of over sixteen months since the Second FOIA Request was filed, the VA's VHA has neither completed its response determinations nor completed its record productions to The Virginian-Pilot or ProPublica in response to the Second FOIA Request.

### FAILURE TO TIMELY MAKE RESPONSE DETERMINATIONS AND/OR MAKE RECORDS "PROMPTLY AVAILABLE" UNDER *CREW*

84. "[I]n order to make a 'determination' and thereby trigger the administrative exhaustion requirement, the agency must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester

that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Responsibility & Ethics in Wash. [CREW] v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013).

85.     "If the agency does not make a 'determination' within the relevant statutory time period, the requester may file suit without exhausting administrative appeal remedies." *Id.* at 185.

86.     The FOIA statute, 5 U.S.C. § 552(a)(6)(C)(i), also provides that "[a]ny person making a request to any agency for records . . . shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of § 552(a)(6)."

87.     VHA has not sent ProPublica or The Virginian-Pilot any response "determination" in connection with the First FOIA Request within the relevant statutory time period.  As a result of OGC's remand to OCLA for a "superseding initial agency decision," OCLA has not sent ProPublica or The Virginian-Pilot any response "determination" in connection with the First FOIA Request within the relevant statutory time period.

88.     By virtue of VHA's indication on October 28, 2016 that "the search is not yet completed," VHA has not sent ProPublica or The Virginian-Pilot a complete response "determination" in connection with the Second FOIA Request within the relevant statutory time period.  Moreover, neither VBA, OPP, nor OIG has sent ProPublica or The Virginian-Pilot any response "determination" in connection with the Second FOIA Request within the relevant statutory time period.

89.     "FOIA requires that the agency make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years."  *CREW*, 711 F.3d at 188.

90.     Neither VHA nor OCLA has made responsive, non-exempt records promptly available to ProPublica or The Virginian-Pilot in connection with the First FOIA Request.

91.     Neither VHA, VBA, OPP, nor OIG has made responsive, non-exempt records promptly available to ProPublica or The Virginian-Pilot in connection with the Second FOIA Request.

## FAILURE TO MAKE GOOD FAITH EFFORT
## TO COMPLY WITH 5 U.S.C. § 552(a)(3)(A)

92.     The FOIA statute requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).

93.     Each of the First FOIA Request and Second FOIA Request (collectively, "First and Second FOIA Requests") reasonably describe the records sought by Plaintiffs and was made in accordance with the published rules for submitting a FOIA request.

94.     VA has not made the requested records "promptly available" to Plaintiffs in response to either of the First and Second FOIA Requests.

95.     In the time since the First FOIA Request was submitted to VA on May 12, 2015 and referred internally to, *inter alia*, VHA shortly thereafter, VHA has neither made

a response "determination" nor produced any responsive, non-exempt records with respect to the First FOIA Request.

96.     In the time since the Second FOIA Request was submitted to VA on September 1, 2015 and referred internally to, *inter alia*, VBA, OPP, and OIG shortly thereafter, VBA, OPP, and OIG have neither provided a written acknowledgment of receipt, made a response "determination," nor produced any responsive, non-exempt records with respect to the Second FOIA Request.

97.     In the time since the Second FOIA Request was submitted to VA on September 1, 2015 and referred internally to, *inter alia*, VHA shortly thereafter, VHA has yet to complete its search for responsive records let alone provide a complete response "determination" and produce any responsive, non-exempt records with respect to the Second FOIA Request.

98.     Following its record search with respect to the First FOIA Request, VHA's "OI&T" provided documents for VHA's FOIA Officer to review "in layers of folders and subfolders [from] which [VHA's FOIA Officer had] to move each document individually," causing the review preceding any release of responsive, non-exempt records to be "slow."

99.     With respect to OI&T's record search in response to the Second FOIA Request, VHA has indicated that "the search is not yet completed" and "OI&T continues to work on retrieving the remaining responsive records"

100.    By letter dated April 6, 2016, a written protest was lodged with a senior official at VA with respect to the "barriers faced by ProPublica and our publishing

partners at The Virginian-Pilot in accessing public information [requested from VA] under the Freedom of Information Act" with respect to the First and Second FOIA Requests.   The protest stated that "[o]ur organizations have been stymied in several important requests for information related to the VA's handling of research related to Agent Orange exposure by Vietnam era veterans."   The protest specifically identified FOIA tracking nos. 15-05014-F and 15-05015-F (corresponding to the First FOIA Request) and FOIA tracking nos. 15-07638-F, 15-07639-F, 15-07641-F (corresponding to the Second FOIA Request).   The protest stated that the VA's "systematic inaction appears to us a lot like a cover up" and requested that VA "look into this matter" and conduct such inquiry "in a transparent manner and with adherence to both the spirit and letter of FOIA."

101.   Plaintiffs did not receive any response from VA with respect to the April 6, 2016 protest letter.

102.   By letter dated July 13, 2016, a written protest was lodged with two senior officials at VA specifically with respect to VA's handling of the Second FOIA Request as had been referred within the department to, *inter alia*, VHA with tracking number 15-07638-F.   The protest complained about "unacceptable barriers and delays faced by ProPublica and The Virginian-Pilot in accessing public information under the Freedom of Information Act."   The protest further stated that "this is beginning to feel a lot like an intentional effort to stonewall."

103.   VA merely docketed the July 13, 2016 protest letter "as an appeal under [FOIA] stemming from a non-response by [VHA]."

104.   By virtue of (i) VA's failure to substantively respond to the complaints lodged in the April 6, 2016 and July 13, 2016 letters with respect to the First and Second FOIA Requests, (ii) VA's failure to provide and/or complete its response "determinations" with respect to the First and Second FOIA Requests, (iii) VA's failure to provide and/or complete its productions of responsive, non-exempt records in response to the First and Second FOIA Requests, (iv) VA's failure to communicate, commit to, and/or meet a timeframe during which VA will discharge its duties under FOIA with respect to the First and Second FOIA Requests, (v) VHA OI&T's failure to conduct searches and/or provide records for VHA's review and potential production in a manner and format conducive to their ready review such that responsive, non-exempt records could be made "promptly available" to ProPublica and The Virginian-Pilot in response to the First and Second FOIA Requests, and (vi) the untimeliness of VA's statutorily-required actions concerning the First and Second FOIA requests, VA has failed to make a good faith effort to comply with 5 U.S.C. § 552(a)(3)(A).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

105.   To the extent necessary, ProPublica and The Virginian-Pilot have exhausted any and all administrative remedies with respect to the August 25, 2015 response determination from VA's OCLA in connection with the First FOIA Request.

106.   To the extent necessary, ProPublica and The Virginian-Pilot have exhausted any and all administrative remedies with respect to the failure to provide a complete response determination on the part of VA's VHA in connection with the Second FOIA Request.

### FIRST CAUSE OF ACTION:
**Unlawful Failure to Disclose Agency Records**
**With Respect to the First FOIA Request**

107.   ProPublica and The Virginian-Pilot repeat and re-allege paragraphs 1-106 above.

108.   ProPublica and The Virginian-Pilot have a legal right under FOIA to obtain the agency records requested from defendant VA in the First FOIA Request, and no legal basis exists for defendant's failure to make available the requested records.

109.   On information and belief, with respect to any searches for records responsive to the First FOIA Request, defendant VA and its components have used or will use a temporal limit, i.e. a "cut-off date" by which records were created, that is earlier than the date of this Complaint.

110.   With respect to the First FOIA Request, defendant VA's (i) failure to provide complete response "determinations," (ii) failure to exercise due diligence with respect to processing the request and making the requested records promptly available, (iii) failure to provide notice of, and use, a reasonable cut-off date with respect to searches for responsive records, (iv) failure to discharge its statutorily-required obligations in good faith, and (v) wrongful withholding of agency records are unlawful, and are in violation of FOIA, including 5 U.S.C. § 552(a)(3), as well as the VA's regulations promulgated under FOIA.

111.   ProPublica and The Virginian-Pilot are entitled to declaratory and injunctive relief with respect to the release and disclosure of the requested records.

**SECOND CAUSE OF ACTION:**
**Violations of the Freedom of Information Act and VA's FOIA Regulation for**
**Failure to Grant Expedited Processing With Respect to the First FOIA Request**

112. ProPublica and The Virginian-Pilot repeat and re-allege paragraphs 1-111 above.

113. The FOIA statute requires that each agency shall "provid[e] for expedited processing of requests for records," *inter alia*, "in cases in which the person requesting the records demonstrates a compelling need." 5 U.S.C. § 552(a)(6)(E)(i)(I).

114. The FOIA statute defines a "compelling need" as meaning, *inter alia*, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

115. The VA's FOIA regulation provides that "[r]equests will be processed out of the order in which they were received by the component responsible for processing the FOIA request and given expedited treatment when VA determines that . . . [t]he failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 38 C.F.R. § 1.556(d)(1)(i).

116. The VA's FOIA regulation provides that "[r]equests will be processed out of the order in which they were received by the component responsible for processing the FOIA request and given expedited treatment when VA determines that . . . [t]here is an urgency to inform the public concerning actual or alleged Federal government activity, if

the request is made by a person primarily engaged in disseminating information." 38 C.F.R. § 1.556(d)(1)(ii).

117.   The VA's FOIA regulation also provides that "[r]equests will be processed out of the order in which they were received by the component responsible for processing the FOIA request and given expedited treatment when VA determines that . . . [t]here is widespread and exceptional interest in which possible questions exist about the government's integrity which affect public confidence."  38 C.F.R. § 1.556(d)(1)(iv).

118.   The FOIA statute further provides "that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request." 5 U.S.C. § 552(a)(6)(E)(ii)(I).

119.   The VA's FOIA regulation further provides that "[w]ithin ten (10) calendar days of its receipt of a request for expedited processing, the FOIA Officer shall determine whether to grant the request and will provide the requester written notice of the decision." 38 C.F.R. § 1.556(d)(3).

120.   Failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."  38 C.F.R. § 1.556(d)(1)(i).

121.   There is urgency to inform the public concerning actual or alleged Federal government activity and each of ProPublica and The Virginian-Pilot are a person primarily engaged in disseminating information entitled to expedited treatment, pursuant to 38 C.F.R. § 1.556(d)(1)(ii).

122.   There is widespread and exceptional interest in the subject matter of the First FOIA Request in which possible questions exist about the government's integrity which affect public confidence, pursuant to 38 C.F.R. § 1.556(d)(1)(iv).

123.   ProPublica and The Virginian-Pilot requested expedited processing by VHA with respect to the First FOIA Request on January 30, 2016 and again on May 25, 2016.  VHA did not even acknowledge the requests for expedited processing let alone grant or deny those requests.

124.   VHA's failure to determine whether to grant ProPublica's and The Virginian-Pilot's requests for expedited processing in connection with the First FOIA Request, and its failure to grant those requests for expedited processing, violates FOIA as well as the VA's regulations promulgated under FOIA.

125.   ProPublica and The Virginian-Pilot are entitled to declaratory and injunctive relief with respect to VHA's failure to act upon, and grant, the requests for expedited processing in connection with the First FOIA Request.

**THIRD CAUSE OF ACTION:**
**Violation of the Administrative Procedure Act for Failure to Timely Respond**
**to Request for Agency Records With Respect to the First FOIA Request**

126.   ProPublica and The Virginian-Pilot repeat and re-allege paragraphs 1-125 above.

127.   The failures of defendant VA to timely respond and provide expedited processing with respect to ProPublica's and The Virginian-Pilot's First FOIA Request for agency records, and defendant VA's withholding of agency records, each constitute agency action unlawfully withheld and unreasonably delayed, in violation of the APA,

5 U.S.C. §§ 701-06.   The failures of defendant VA to timely respond and provide expedited processing, and its withholdings, each are arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law, all in violation of the APA.

128.   ProPublica and The Virginian-Pilot are entitled to declaratory and injunctive relief with respect to the release and disclosure of the requested records in connection with the First FOIA Request.

**FOURTH CAUSE OF ACTION:**
**Unlawful Failure to Disclose Agency Records**
**With Respect to the Second FOIA Request**

129.   ProPublica and The Virginian-Pilot repeat and re-allege paragraphs 1-128 above.

130.   ProPublica and The Virginian-Pilot have a legal right under FOIA to obtain the agency records requested from defendant VA in the Second FOIA Request, and no legal basis exists for defendant's failure to make available the requested records.

131.   On information and belief, with respect to any searches for records responsive to the Second FOIA Request, defendant VA and its components have used or will use a temporal limit, i.e. a "cut-off date" by which records were created, that is earlier than the date of this Complaint.

132.   With respect to the Second FOIA Request, defendant VA's (i) failure to provide complete response "determinations," (ii) failure to exercise due diligence with respect to processing the request and making the requested records promptly available, (iii) failure to provide notice of, and use, a reasonable cut-off date with respect to

searches for responsive records, (iv) failure to discharge its statutorily-required obligations in good faith, and (v) wrongful withholding of agency records are unlawful, and are in violation of FOIA, including 5 U.S.C. § 552(a)(3), as well as the VA's regulations promulgated under FOIA.

133.    ProPublica and The Virginian-Pilot are entitled to declaratory and injunctive relief with respect to the release and disclosure of the requested records.

**FIFTH CAUSE OF ACTION:**
**Violations of the Freedom of Information Act and VA's FOIA Regulation for**
**Failure to Grant Expedited Processing With Respect to the Second FOIA Request**

134.    ProPublica and The Virginian-Pilot repeat and re-allege paragraphs 1-133 above.

135.    The FOIA statute requires that each agency shall "provid[e] for expedited processing of requests for records," *inter alia*, "in cases in which the person requesting the records demonstrates a compelling need."  5 U.S.C. § 552(a)(6)(E)(i)(I).

136.    The FOIA statute defines a "compelling need" as meaning, *inter alia*, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

137.    The VA's FOIA regulation provides that "[r]equests will be processed out of the order in which they were received by the component responsible for processing the FOIA request and given expedited treatment when VA determines that . . . [t]he failure to obtain the requested records on an expedited basis could reasonably be expected to pose

an imminent threat to the life or physical safety of an individual." 38 C.F.R. § 1.556(d)(1)(i).

138.   The VA's FOIA regulation provides that "[r]equests will be processed out of the order in which they were received by the component responsible for processing the FOIA request and given expedited treatment when VA determines that . . . [t]here is an urgency to inform the public concerning actual or alleged Federal government activity, if the request is made by a person primarily engaged in disseminating information." 38 C.F.R. § 1.556(d)(1)(ii).

139.   The VA's FOIA regulation also provides that "[r]equests will be processed out of the order in which they were received by the component responsible for processing the FOIA request and given expedited treatment when VA determines that . . . [t]here is widespread and exceptional interest in which possible questions exist about the government's integrity which affect public confidence." 38 C.F.R. § 1.556(d)(1)(iv).

140.   The FOIA statute further provides "that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request." 5 U.S.C. § 552(a)(6)(E)(ii)(I).

141.   The VA's FOIA regulation further provides that "[w]ithin ten (10) calendar days of its receipt of a request for expedited processing, the FOIA Officer shall determine whether to grant the request and will provide the requester written notice of the decision." 38 C.F.R. § 1.556(d)(3).

142.   Failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 38 C.F.R. § 1.556(d)(1)(i).

143.   There is urgency to inform the public concerning actual or alleged Federal government activity and each of ProPublica and The Virginian-Pilot are a person primarily engaged in disseminating information entitled to expedited treatment, pursuant to 38 C.F.R. § 1.556(d)(1)(ii).

144.   There is widespread and exceptional interest in the subject matter of the First FOIA Request in which possible questions exist about the government's integrity which affect public confidence, pursuant to 38 C.F.R. § 1.556(d)(1)(iv).

145.   ProPublica and The Virginian-Pilot requested expedited processing by VHA, VBA, and OPP with respect to the Second FOIA Request on May 25, 2016. Neither VHA, VBA, nor OPP acknowledged the request for expedited processing let alone communicated a decision granting or denying the request.

146.   The failures by VHA, VBA, and OPP to determine whether to grant ProPublica's and The Virginian-Pilot's request for expedited processing in connection with the Second FOIA Request, and their failures to grant the request for expedited processing, violates FOIA as well as the VA's regulations promulgated under FOIA.

147.   ProPublica and The Virginian-Pilot are entitled to declaratory and injunctive relief with respect to the failures by VHA, VBA, and OPP to act upon, and grant, the request for expedited processing in connection with the Second FOIA Request.

## SIXTH CAUSE OF ACTION:
**Violation of the Administrative Procedure Act for Failure to Timely Respond to Request for Agency Records With Respect to the Second FOIA Request**

148.    ProPublica and The Virginian-Pilot repeat and re-allege paragraphs 1-147 above.

149.    The failures of defendant VA to timely respond and provide expedited processing with respect to ProPublica's and The Virginian-Pilot's Second FOIA Request for agency records, and defendant VA's withholding of agency records, each constitute agency action unlawfully withheld and unreasonably delayed, in violation of the APA, 5 U.S.C. §§ 701-06.  The failures of VA to timely respond, and its withholdings, each are arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law, all in violation of the APA.

150.    ProPublica and The Virginian-Pilot are entitled to declaratory and injunctive relief with respect to the release and disclosure of the requested records in connection with the Second FOIA Request.

## REQUESTS FOR RELIEF

WHEREFORE, ProPublica and The Virginian-Pilot request that judgment be entered in their favor and against defendant, and that:

a) defendant and any of defendant's agents or other persons, departments, or components acting for, with, by, through or under them be ordered to promptly conduct an expedited and reasonable search for records responsive to ProPublica's and The Virginian-Pilot's requests under FOIA;

b) defendant and any of its agents or other persons, departments, or components acting for, with, by, through or under them be enjoined and restrained from continuing to fail to process and withhold records relevant to ProPublica's and The Virginian-Pilot's requests under FOIA and in violation of the APA;

c) the Court permit discovery with respect to whether defendant has made a good faith effort to discharge its statutorily-required obligations under FOIA and make the requested records promptly available to ProPublica and The Virginian-Pilot, and provide requested relief as warranted;

d) the Court declare that the requested records are not exempt from disclosure under FOIA and order defendant to disclose the requested records in their entireties and make copies available to ProPublica and The Virginian-Pilot;

e) the Court enter a judgment awarding ProPublica and The Virginian-Pilot reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412; and

f) the Court award all other such relief to ProPublica and The Virginian-Pilot as this Court deems just, proper and equitable.

Dated:  January 19, 2017          Respectfully submitted,

/s/ Seth A. Watkins
Seth A. Watkins (D.C. Bar # 467470)
   Email:  watkins@adduci.com
ADDUCI, MASTRIANI & SCHAUMBERG LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 407-8647
Facsimile: (202) 466-2006

*Attorneys for Plaintiffs Pro Publica, Inc. and Virginian-Pilot Media Companies, LLC*